## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FRANCISCO ILLARRAMENDI,
     Petitioner,

    v.                           No. 3:16-cv-1853 (SRU)

UNITED STATES,
     Respondent.

## RULING AND ORDER ON
## MOTION TO VACATE, CORRECT OR SET ASIDE SENTENCE

Francisco Illarramendi, currently imprisoned at Federal Correctional Institution Fairton in

Fairton, New Jersey, filed the instant motion to vacate, set aside, or correct his sentence ("habeas

petition"), pursuant to 28 U.S.C. § 2255.  Illarramendi principally argues that his conviction and

sentence should be vacated because: (1) a pre-trial temporary restraining order entered by

District Judge Janet B. Arterton in a related Securities Exchange Commission proceeding, which

froze his assets and rendered him unable to afford his then-attorney, violated his Sixth

Amendment right to be represented by counsel of choice; (2) the government did not comply

with its *Brady* obligations; (3) his appellate counsel's failure to terminate his representation upon

request violated his right to self-representation; and (4) his attorneys' failure to present certain

arguments and evidence violated his right to effective assistance of counsel.  *See generally* Mot.,

Doc. No. 1.  Based on the entire record and for the reasons that follow, I conclude that those

arguments are without merit and that there is no need to hold a hearing in this case.

Illarramendi's habeas petition is therefore **denied**.

## I.      Legal Standard

Section 2255 provides a prisoner in federal custody an opportunity to challenge the

legality of his or her sentence.  To obtain relief under section 2255, a petitioner must show that

his or her prior sentence was invalid because: (1) it was imposed in violation of the Constitution or the laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) it exceeded the maximum detention authorized by law; or (4) it is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). The standard is stringent; even constitutional errors will not be redressed through a section 2255 petition unless they have had a "substantial and injurious effect" that results in "actual prejudice" to the petitioner. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal citations omitted); *see also Underwood v. United States*, 166 F.3d 84, 87 (2d Cir. 1999) (applying *Brecht*'s harmless error standard to section 2255 petitions). The petitioner bears the burden of proving that he or she is entitled to relief by a preponderance of the evidence. *Blackmon v. United States*, 2019 WL 3767511, at *4 (D. Conn. Aug. 9, 2019) (citing *Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000)).

A federal prisoner may not use a section 2255 petition to relitigate questions that were expressly or impliedly resolved during a direct appeal, unless there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Becker*, 502 F.3d 122, 127 (2d Cir. 2013) (internal citations omitted); *see also United States v. Munoz*, 143 F.3d 632, 637 (2d Cir. 1998) ("A motion under § 2255 is not a substitute for an appeal."). A petitioner is also barred from raising a claim on habeas review that was not properly raised on direct review unless the petitioner is able to show "cause and actual prejudice" or "actual innocence." *See Bousley v. United States*, 523 U.S. 614, 622 (1998); *Reed v. Farley*, 512 U.S. 339, 358 (1994). A petitioner may, however, bring a claim of ineffective assistance of counsel that was not raised previously at trial or on appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

Under section 2255, a petitioner is entitled to a hearing "[u]nless the motion and the files

and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "Mere generalities or hearsay statements will not normally entitle the applicant to a hearing . . . . The petitioner must set forth specific facts which he is in a position to establish by competent evidence." *Dalli v. United States*, 491 F.2d 758, 760–61 (2d Cir. 1974) (citations omitted). In the absence of supporting facts, the court may resolve a petitioner's claims without a hearing. *See id.*

## II. Background

### A. Criminal Action

From approximately 2006 through 2011, Illarramendi engaged in a Ponzi scheme to defraud investors, creditors, and the Securities Exchange Commission ("SEC"). *United States v. Illarramendi*, 11-cr-41 (SRU) ("Criminal Action"), Doc. No. 10, at 12–13.[1] On March 7, 2011, pursuant to a written plea agreement, Illarramendi waived indictment and pled guilty to each count of a five-count information. *See* Criminal Action, Doc. No. 10. The counts were as follows:

1. Two counts of wire fraud, in violation of 18 U.S.C. § 1343;
2. One count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5;
3. One count of investment advisor fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17; and
4. One count of conspiracy to obstruct justice, in violation of 18 U.S.C. § 371.

*Id.*

The plea agreement provided, in relevant part, that Illarramendi understood that the total maximum sentence he could receive if the sentences were imposed consecutively was seventy years of imprisonment. *Id*. at 4. The plea agreement further stated that Illarramendi

---

[1] Unless otherwise indicated, docket citations refer to the instant habeas proceeding: 16-cv-1853 (SRU).

acknowledged that the government had reserved its right to seek restitution under 18 U.S.C. § 3663A, and that Illarramendi agreed to cooperate with the SEC and the receiver who was appointed in *Securities and Exchange Commission v. Illarramendi*, No. 3:11-cv-78 (JBA) ("SEC Action"), in an effort to make restitution. *Id*.

John Gleason represented Illarramendi during the waiver of indictment and guilty plea proceeding, over which I presided. At that proceeding, the following exchange occurred:

> THE COURT: Have you had a chance to speak with Mr. Gleason about your case?
> THE DEFENDANT: Extensively.
> THE COURT: And have you spoken with him about today's proceeding?
> THE DEFENDANT: Yes.
> THE COURT: Are you satisfied with his representation of you so far?
> THE DEFENDANT: I am.

Criminal Action, Doc. No. 9, Hearing Tr. at 6:13–21.

I asked the Assistant United States Attorney ("AUSA") to review the maximum possible sentences under the applicable statutes, and then asked Illarramendi whether he understood the potential sentence that he faced if he pled guilty. *Id*. at 11:22–13:20. Illarramendi stated that he did. *Id*. at 13:21. I subsequently asked Illarramendi to repeat the maximum sentence that he faced, and he correctly responded that it was seventy years. *Id*. at 13:22–25.

In addition, I discussed calculations relating to the Guidelines range and explained that the offense level could be affected by factual findings, including the amount of the loss. *Id*. at 23:20–26:12. I also inquired into the discussions that Illarramendi had with Gleason about the Guidelines:

> THE COURT: All right. Have you discussed with Mr. Gleason sentencing in general in the federal court and the sentencing guidelines in particular?
> THE DEFENDANT: Yes, I have.
> THE COURT: Has he given you some advice or prediction about how you're likely to be sentenced in this case?
> THE DEFENDANT: We've discussed possibilities.

THE COURT: Very good. And you understand that whatever he's told you is not binding on the court, but rather, simply his best advice about likely outcomes?
THE DEFENDANT: I do.

*Id*. at 25:19–26:5.

I later asked the AUSA to summarize the plea agreement. In doing so, the AUSA stated that the parties had not stipulated to an offense level, and that such offense level "could be extremely high given the potential losses here in the hundreds of millions of dollars." *Id*. at 33:12–19. I asked Illarramendi whether anything the AUSA said "when he was describing the plea agreement . . . either surprised [him] or was different from what [he thought] the document [said]." *Id*. at 36:21–25. Illarramendi said no. *Id*.

On January 25, 2015, I sentenced Illarramendi to 156 months of imprisonment, three years' supervised release, and a $500 special assessment. *Id*., Doc. Nos. 163, 183. On February 23, 2015, Illarramendi filed a notice of appeal, challenging the calculation of the sentencing range and the procedural reasonableness of his sentence. The Second Circuit affirmed the sentence on May 11, 2016. *Id*., Doc. No. 202. Illarramendi then requested an *en banc* panel rehearing, which was denied. *United States v. Illarramendi*, 15-526 (2d Cir.) ("Sentencing Appeal"), Doc. Nos. 92, 94.

During the pendency of that appeal, on December 11, 2015, I ordered restitution in the amount of $370,482,716.54, to be distributed pro rata in the amounts and to the victims identified by the receiver. Criminal Action, Doc. No. 198. Illarramendi appealed the order, and the Second Circuit affirmed on May 15, 2017. *Id*., Doc. No. 204. Illarramendi filed a petition for an *en banc* panel rehearing, which was denied. *See United States v. Illarramendi*, 15-4160 (2d Cir.) ("Restitution Appeal"), Doc. Nos. 95, 99.

At the same time as the Criminal Action, Illarramendi was sued by the SEC. *Securities and Exchange Commission v. Illarramendi*, No. 3:11-cv-78 (JBA) (the "SEC Action"). On January 14, 2011, the SEC moved for a temporary restraining order, for an order freezing Illarramendi's assets, and for the appointment of a receiver for the purpose of marshalling, preserving, and managing the defendants' assets. *Id.*, Doc. No. 2. Illarramendi, through counsel, opposed the motion and requested a "carve-out" for living expenses and attorneys' fees in the event the court ordered an asset freeze. *Id.*, Doc. No. 20. Judge Arterton granted the SEC's motion and denied Illarramendi's motion for a carveout "without prejudice to renew . . . with all of the requisite documentation on assets, of attorneys' fees to date, and plans going forward," reasoning that "[a]t this point there is almost nothing, if not nothing, that the Court has before it on which to authorize any sort of carveout." *Id.*, Doc. No. 87, Hr'g Tr. at 36:16–37:1. Judge Arterton entered a TRO freezing Illarramendi's assets on January 28, 2011, *id.*, doc. no. 36, and entered the preliminary injunction on February 3, 2011, *id.*, doc. no. 67. A receiver was also appointed on February 3, 2011. *Id.*, Doc. No. 66.

At the time the TRO was imposed, which was approximately one month before Illarramendi pled guilty, Illarramendi was represented by the law firm of Bingham, McCutchen LLP ("Bingham") in the SEC Action. Mot., Doc. No. 1, at ¶ 6. Bingham had been hired by the receivership companies on Illarramendi's behalf under a retainer payment of $500,000. *Id.* After the TRO was entered, Bingham notified Illarramendi that they could not continue to represent him in either the SEC Action or in any possible criminal proceeding unless Illarramendi was able to borrow funds to pay an additional retainer, which was estimated to be at least $400,000 for the criminal proceedings. *Id.* Unable to afford that amount due to the asset freeze, Illarramendi sought out other attorneys, most of whom required similar retainers due to

the complexity of the case and financial expertise required. *Id.* at ¶ 7. Illarramendi proceeded to

retain the only lawyer who was willing to represent him: John Gleason. *Id.* Gleason agreed to

be paid a maximum fee of $150,000, plus disbursements, for both the civil and criminal

proceedings.[2] *Id.*

On September 25, 2011, Illarramendi renewed his motion for a carveout for $800,000 in

living expenses and attorneys' fees. SEC Action, Doc. No. 592, at 4. A hearing was held on

July 3, 2013, and Judge Arterton denied without prejudice the motion because it was not

supported by sufficient facts. *Id.*, Doc. No. 739. On August 12, 2016, after he filed the instant

habeas petition, Illarramendi, proceeding *pro se*, moved again for a carveout of $100,000 in the

SEC Action to pay for his "counsel of choice" in the Criminal Action and habeas proceeding.

SEC Action, Doc. No. 1022. In that motion, Illarramendi argued that the preliminary injunction

violated his pre-trial Sixth Amendment rights by freezing his untainted assets and rendering him

unable to afford counsel of his choice. *Id.*

The court denied the motion. *See* SEC Action, Doc. No. 1086. In so ruling, Judge

Arterton weighed an order that I previously entered in the instant action, which stated:

"Illarramendi's petition raises complex legal issues that would likely benefit from the assistance

of counsel. If Illarramendi would like to receive such assistance, but cannot afford to hire

counsel, he should file a motion to appoint counsel within 30 days from the date of this Order."

Doc. No. 14. Judge Arterton concluded that there was "no need to modify the asset freeze order

entered in this action to retain legal representation instead of accepting Judge Underhill's offer of

---

[2] About a year later, Illarramendi discharged Gleason because he was "not competent in terms of subject-matter expertise and legal background." *Id.* at ¶ 8. Gleason filed a motion to withdraw, which was granted in the Criminal Action on February 10, 2012 and in the SEC Action on February 24, 2012. Criminal Action, Doc. No. 30; SEC Action, Doc. No. 460. Alex Hernandez was then appointed to represent Illarramendi in the Criminal Action on February 10, 2012. Criminal Action, Doc. No. 34.

appointment of counsel and certainly no need which outweighs the interest in protecting assets for distribution for defrauded investors." *See* SEC Action, Doc. No. 1086.

On April 13, 2017, Judge Arterton granted the SEC's motion for summary judgment on the basis of Illarramendi's admissions before that court, and on the basis that his guilty plea in the Criminal Action collaterally estopped him from denying liability for violations of the same statutory provisions in a civil proceeding. *Sec. & Exch. Comm'n v. Illarramendi*, 260 F. Supp. 3d 166, 171–80 (D. Conn. 2017), *aff'd as modified sub nom. United States Sec. & Exch. Comm'n v. Illarramendi*, 732 F. App'x 10 (2d Cir. 2018). The ruling ordered Illarramendi to disgorge his gains of $25,844,834 and pay a penalty of one million dollars. *Id*. at 185.

## III. Discussion

### A. Sixth Amendment Right to Counsel of Choice

Illarramendi first argues that the TRO violated his Sixth Amendment right to counsel of choice in the Criminal Action because it restrained all of his assets and forced him to retain a different attorney. Illarramendi relies primarily on *Luis v. United States* as support, which held that the "pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." 136 S. Ct. 1083, 1088 (2016).

As a preliminary matter, the argument is procedurally barred because Illarramendi already raised it on direct appeal of my restitution order. In a letter to the Second Circuit dated April 11, 2016, less than two weeks after the *Luis* decision was issued, Illarramendi argued that the TRO violated his constitutional right to counsel of his choice under *Luis*. *See United States v. Illarramendi*, 15-4160 (2d Cir.) ("Restitution Appeal"), Doc. No. 33. On June 23, 2016, Illarramendi moved for the Second Circuit to hold the appeal in abeyance pending the outcome of various motions in the district court, including a motion that he planned to file in the SEC

Action to obtain a carve-out of the TRO and secure his counsel of choice. *Id.*, Doc. No. 43-1. In that motion, Illarramendi argued at length that abeyance was warranted in light of the *Luis* decision and because Attorney Truskoski, his lawyer at the time, was not his counsel of choice. *Id.*

On July 18, 2016, Illarramendi advanced that argument again in another letter to the Second Circuit. *Id.*, Doc. No. 59-1. He noted in that letter that Truskoski's continued representation violated his Sixth Amendment right to counsel of choice under *Luis* and requested that the court terminate Truskoski's representation and grant his motion to hold the appeal in abeyance. *Id.*

The Second Circuit affirmed the restitution order on February 22, 2017. *Id.*, Doc. No. 80. Although the Second Circuit's ruling did not explicitly mention the *Luis* argument, it stated that "[w]e have considered Illarramendi's remaining arguments on appeal and find them to be without merit." *Id.*, Doc. No. 80, at 3. Illarramendi raised the claim once more in his petition for an *en banc* panel rehearing, which was denied. *Id.*, Doc No. 99.

It is well-settled that a habeas petitioner may not relitigate questions that were expressly or impliedly resolved during a direct appeal, absent "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Becker*, 502 F.3d at 127 (internal citations omitted). Because none of the exceptions applies, Illarramendi is barred from relitigating the *Luis* argument here.

Even if Illarramendi's counsel-of-choice argument was not procedurally barred, it would nonetheless fail on the merits. Central to the holding in *Luis* was the seizure of *untainted* assets—that is, "funds not connected with the crime." *Luis*, 136 S. Ct. at 1088 ("The Government and Luis agree that this court order will prevent Luis from using her own untainted

funds, *i.e.*, funds not connected with the crime.").  The Court heavily weighed the nature of the

assets at issue in distinguishing Luis's case from two of its precedents, *Caplin & Drysdale,*

*Charter v. United States*, 491 U.S. 614 (1989), and *United States v. Monsanto*, 491 U.S. 600

(1989), both of which held that the seizure of tainted assets did not violate the Sixth Amendment.

*Luis*, 163 S. Ct. at 1090 ("[t]he relevant difference . . . consists of the fact that the property here

is untainted").

      Here, the SEC did not seek to restrain "untainted" property.  *See United States v.*

*Cardroom Int'l, LLC*, 726 F. App'x 98, 100 (2d Cir. 2018) (distinguishing *Luis* on that basis).

Indeed, the government has made no affirmative concession that Illarramendi's assets were not

connected with criminal activity.  Resp., Doc. No. 10, at 16 ("Here, the SEC and the Receiver

contend that the seized assets are tainted.").

      Moreover, Illarramendi has not otherwise established by a preponderance of the evidence

that his frozen assets were untainted.  Illarramendi maintains that some of the assets seized—

including (1) an apartment purchased in 1996 in Bethesda, Maryland;[3] (2) an apartment

purchased in 1999 in Caracas, Venezuela; and (3) an apartment purchased in 2004 in New York

City—were untainted because they were acquired before the charged criminal conduct began.

Mot., Doc. No. 1, at 1.  Because Illarramendi has not articulated sufficient facts in support, his

argument cannot stand.

      In addition, the receiver in the SEC Action asserted that, "[e]ven though some of the

assets the Receiver liquidated were acquired prior to the fraud, those assets undoubtedly have

been tainted by the fraud and by funds diverted by Illarramendi to improve and maintain these

assets."  SEC Action, Doc. No. 1039, at 14 n.16.  Significantly, public land records, of which I

---

[3] A review of Maryland's land records revealed that an individual named Francisco Illarramendi did not purchase property in Bethesda until 2000.

may take judicial notice,[4] indicate that Illarramendi purchased the New York City apartment with a significant mortgage. *See* April 29, 2015 Mortgage to Francisco Illarramendi, NEW YORK CITY DEP'T OF FINANCE, AUTOMATED CITY REGISTER INFORMATION SYSTEM, https://a836-acris.nyc.gov/DS/DocumentSearch/PartyName. Because nothing in the record suggests that Illarramendi had an untainted source of income after 2006, it follows that the mortgage was serviced with proceeds derived from Illarramendi's crimes; thus, the apartment would constitute a tainted asset. *See United States v. Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) (affirming the district court's order denying a criminal defendant's motion to release proceeds from the sale of his house, which were frozen in a parallel civil enforcement action and which he sought to pay for his defense, because the house was "purchased with" funds traceable to the alleged crime).

Illarramendi propounds an additional, conclusory argument that all of his assets were untainted because "certain aspects of the case have both an exonerating effect on my actions and an invalidating effect on the PDSVA Claim." Mot., Doc. No. 1, at 2 n.2. He further contends that "[f]or assets to be ultimately forfeited (or Restitution affirmed), a final and legal conviction has to occur and it has not yet occurred here, particularly due to the constitutional errors." *Id.* As discussed below, both arguments are belied by the record. Moreover, those assertions fail to support his argument that the seized assets were not associated with underlying criminal activity under *Luis*.

---

[4] Under Federal Rule of Evidence 201, courts may take judicial notice of facts outside the pleadings, provided that those facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Accordingly, courts have routinely taken judicial notice of matters of public record. *See, e.g.*, *Bailey v. Interbay Funding, LLC*, 2018 WL 1660553, at *2 n. 2 (D. Conn. Apr. 4, 2018) (internal citations omitted).

In sum, because Illarramendi has not met his burden of proving that his frozen assets were untainted, I conclude that he has not demonstrated a violation of his right to counsel of choice.

Illarramendi additionally asserts that he was not afforded a *Monsanto* post-restraint hearing after the TRO was imposed, which "contributed to the '*Luis* structural error.'" Supplemental Filing, Doc. No. 28, at 10. A *Monsanto* hearing "vindicates a defendant's Sixth Amendment right to counsel by testing in an adversary hearing whether seized assets are properly forfeitable in circumstances where the defendant has insufficient assets from which to fund his defense." *United States v. Cosme*, 796 F.3d 226, 232 (2d Cir. 2015) (citing *United States v. Monsanto*, 924 F.2d 1186, 1203 (2d Cir. 1991) (en banc), *abrogated in part on other grounds by Kaley v. United States,* 571 U.S. 320 (2014)). According to Illarramendi, had that hearing taken place, the court would have determined that he "owned more than $2.0 million in untainted assets and would have been compelled to 'order the release of funds in an amount necessary to pay reasonable attorneys' fees for counsel.'" *Id*. at 10.

Because, as discussed, Illarramendi has not established that his assets were not connected to criminal activity, Illarramendi has correspondingly not demonstrated that a *Monsanto* hearing would have resulted in an order lifting or narrowing the asset freeze. Moreover, as the government points out, Judge Arterton held multiple hearings on the issue whether to grant a carve-out for legal fees; Illarramendi could have argued then that his assets were untainted. For those reasons, any failure to hold a *Monsanto* hearing was not a fundamental error that would "inherently result in a complete miscarriage of justice." *Hill v. United States*, 368 U.S. 424, 428 (1962).

B. *Brady* Obligations

Illarramendi next argues that the government violated its obligations under *Brady v. Maryland,* 373 U.S. 83 (1963), because it "purposely withheld . . . important exculpatory information which it had gathered" while investigating the defendant in connection with *United States v. Alejandro Andrade Cedeno,* 17-cr-80242, a proceeding in the Southern District of Florida (the "*Andrade* case"). Supplemental Filing, Doc. No. 30, at 4. Appended to his filing is the information filed against Andrade, the plea agreement, and the "Government's Memorandum Concerning Victim's Notice and Restitution." Illarramendi cites specifically to the victim's memorandum, which states:

> the Government of Venezuela's complicity in this conspiracy renders victim status inappropriate under any applicable statute. The defendant, who accepted bribe payments to authorize co-conspirators to conduct currency exchanges on behalf of the Venezuelan Government, was the Venezuelan National Treasurer. Under these circumstances . . . it would be inappropriate to afford the Government of Venezuela victim status for purposes of the [Mandatory Victim Restitution Act of 1996] or any other applicable statute.

Doc. No. 30, at 38.

According to Illarramendi, those filings corroborate how the Petroleos de Venezuela, S.A. ("PDVSA") has "unclean hands" and therefore is ineligible for restitution. *Id*. at 6–7. Illarramendi further argues that the PDVSA's claim should thus not have been used as a basis for calculating loss at sentencing. *Id*. at 8.

To establish a *Brady* violation, the following three elements must be established: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001) (citing *Strickler v. Greene*, 527 U.S 263 at 281–82)). Illarramendi has failed to establish those elements here.

First, although Illarramendi claims that the Government of Venezuela is "effectively the same entity as PDVSA," he provides no facts to support that allegation. Moreover, unlike Andrade, PDVSA was not an alleged co-conspirator in the Criminal Action, and, further, any evidence of PDVSA's or the Venezuelan government's complicity does not pertain to Illarramendi's gain, which was the measure I used for sentencing guidelines purposes.

Second, Illarramendi has presented no facts to support how the government possessed exculpatory evidence during the pendency of the Criminal Action. The *Andrade* case was initiated in another district in December 20, 2018, nearly four years after I sentenced Illarramendi and three years after I ordered restitution. The conclusory allegation that "the investigation was ongoing since well before sentencing" fails to cure that defect. *See* Supplemental Filing, Doc. No. 30, at 9.

Finally, Illarramendi has not established prejudice. He previously raised the argument that the PDVSA did not have clean hands in his sentencing brief to no avail, and he has not proffered any new facts that would lead me to now view that argument as meritorious or to alter his sentence or restitution order. For that reason, Illarramendi has not established by a preponderance of the evidence that the government violated its *Brady* obligations, nor has he established how any violations had a "substantial and injurious effect" on his defense. *Brecht*, 507 U.S. at 623 (internal citations omitted).

C. Sixth Amendment Right to Self-Representation

Illarramendi next claims that his constitutional right to self-representation was violated when Attorney Truskoski, his attorney on appeal, did not terminate his representation after Illarramendi requested that he do so. Supplemental Filing, Doc. No. 15, at 10. Because Illarramendi raised that argument in his petition for an *en banc* panel rehearing with respect to

my restitution order, doc. no. 95, that claim is procedurally barred because the Second Circuit denied the petition. *See Peeler*, 2006 WL 1806177, at *4 (D. Conn. June 28, 2006) (citing *United States v. Kennedy*, 21 F. App'x 82 (2d Cir. 2001)).

D. <u>Sixth Amendment Right to Effective Assistance of Counsel</u>

Illarramendi advances a number of arguments in support of his claim that he received ineffective assistance of counsel, most of which are belied by the record and all of which lack legal merit. A petitioner asserting ineffective assistance of counsel must establish that "(1) his counsel's performance was objectively deficient, and (2) petitioner was actually prejudiced as a result." *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012) (citing *Strickland*, 466 U.S. at 687–88)). With respect to the first prong, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Id.* at 129–30 (citing *Strickland*, 466 U.S. at 690). With respect to the second prong, the petitioner must establish that "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Davis v. Mantello*, 42 F. App'x 488, 491 (2d Cir. 2002) (internal citations omitted).

A habeas petitioner claiming ineffective assistance bears a heavy burden. There is a "strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance," *Strickland*, 466 U.S. at 689, and courts have "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox, or downright ill-advised." *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996) (internal citations omitted). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"

*Harrington v. Richter,* 562 U.S. 86, 104 (2011) (quoting *Strickland,* 466 U.S. at 694).

    1.  *Plea Negotiations*

Illarremendi argues that Attorney Gleason was constitutionally ineffective throughout plea negotiations because he did not advise Illarramendi of the possible loss enhancement and the applicability of affirmative defenses. In particular, Illarramendi asserts that Gleason did not discuss with him the loss enhancement or its consequences, and that Illarramendi was otherwise "not aware of the parameters which govern loss calculations or what the weight of the loss calculation would be on sentencing." Supplemental Filing, Doc. No. 15, at 11; *see also* Mot., Doc. No. 1, at 31 ("I had not seen the Sentencing Guideline Instructions on Calculable Loss . . . nor was I even formally told of the existence of sentencing guideline instructions to calculate the Loss Enhancement and how that could affect my sentence."). Illarramendi avers that, as a result, his plea was not knowing and voluntary.

Illarramendi's sworn testimony, as well as Gleason's affidavit, contradict those allegations. In his affidavit, Gleason asserts that he explained to Illarramendi that "the amount of the loss to investors was a factor that could elevate the sentencing guidelines and result in a longer sentence." Ex. A to Resp., Doc. No. 10-1, ¶ 20. Gleason also stated that he discussed in detail "the various sentences he could expect to receive under the guidelines." *Id.*

Illarramendi's testimony during the plea colloquy corroborates those statements. During the plea colloquy, the AUSA explained that "the parties have not stipulated to an offense level" and that the offense level "could be extremely high given the potential losses here in the hundreds of millions of dollars." Criminal Action, Doc. No. 9, Hr'g Tr., at 33:12–19.

Illarramendi stated that he was not surprised by the AUSA's description of the plea agreement. *See id*. at 36:21–25.[5]

The AUSA also reviewed the maximum possible sentence. Illarramendi stated that he understood the maximum possible sentence that he could face and confirmed that the maximum overall term of imprisonment that he faced if he pled guilty was seventy years. *Id*., at 11:22–13:25. Illarramendi further indicated that he spoke with Attorney Gleason about the sentencing guidelines, that they spoke "extensively" about his case, and that he was satisfied with Gleason's representation. *Id*. at 6:13–21, 25:19–26:5.

Illarramendi's sworn statements, which demonstrate that he understood the consequences of a possible loss enhancement, are subject to a "strong presumption of veracity which cannot be overcome by conclusory allegations." *See Rosenberger v. United States*, 133 F. App'x 799, 801 (2d Cir. 2005); *see also United States v. Hernandez*, 242 F.3d 110, 112–13 (2d Cir. 2001) (rejecting a defendant's assertion that he was misled about the consequences of his guilty plea by his attorney because "[t]he district court was entitled to rely upon the defendant's sworn statements, made in open court . . . that he understood the consequences of his plea"); *United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997) ("A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea."). Illarramendi's claims "that are contrary to the record should not, and will not, be credited." *Peeler*, 2006 WL 1806177, at *5 (quoting *United States v. Gonzalez*, 970 F.2d 1095, 1101 (2d Cir. 1992)).

---

[5] Indeed, no educated person would think that an alleged Ponzi scheme with hundreds of millions of dollars of alleged losses, *see* Information, doc. no. 3, at 3, was anything other than a serious crime. *Cf.* Sentencing Order, Doc. No. 118, *United States v. Bernard Madoff*, 9-cr-213-DC (S.D.N.Y. 2009) (sentencing Madoff to 150 years following plea of guilty to eleven counts of securities fraud, investment advisor fraud, wire and mail fraud, money laundering, making false statements, perjury, filing false documents with the SEC, and theft from employee benefit fund).

Illarramendi's ineffective assistance of counsel claim also rests on the alleged advice that he received from Gleason that "he believed, based on [Illarramendi's] cooperation with the Receiver and positive rapport with the [AUSA], that [Illarramendi] would get a maximum of 'six months in jail or maybe even no jail time at all.'" Mot., Doc. No. 1, at 31. Upon the filing of Gleason's affidavit, Illarramendi clarified in a subsequent filing: "[b]y his own admission, Mr. Gleason confirms what I state in the Habeas Petition, that my understanding from his advice was that, by pleading guilty, I may be 'spared incarceration and given probation.'" Supplemental Filing, Doc. No. 15, at 14.

Gleason's affidavit provides important context to those statements. The affidavit states, in relevant part, that Gleason advised Illarramendi that "trial of the charges in the Information would most likely result in a guilty verdict" and "that offering a plea agreement, and admitting culpability together with other things, would greatly increase the likelihood that the Court would spare him incarceration and grant probation or at least result in a lowering of the federal sentencing guidelines." Ex. A to Resp., Doc. No. 10-1, at ¶¶ 14, 16. Gleason recommended that Illarramendi pursue a plea agreement because, upon examining the government's evidence against Illarramendi, "a trial would likely result in a guilty verdict since . . . there was no meritorious defense available to him." *Id*.

Gleason offered Illarramendi that advice after the SEC investigation revealed evidence that Illarramendi engaged in a Ponzi scheme, and after Illarramendi had been charged via an information with wire fraud, securities fraud, and conspiracy. *Id*. at ¶¶ 13, 14. Illarramendi thereafter elected to cooperate with the government, to voluntarily disclose his offense, and to offer the government information about Venezuela's government and politics. *Id*. at ¶¶ 17, 18.

Considering that backdrop, I conclude that Gleason was not advising Illarramendi on his likely sentence or sentencing exposure at the time, but rather was explaining to Illarramendi why offering a plea agreement and cooperating would likely reduce his sentence and thus was the best route to follow.  Further supporting my conclusion is the fact that, on what appears to have been a separate occasion, Gleason did advise Illarramendi on possible sentences.  Gleason specifically walked Illarramendi through "the various sentences he could expect to receive under the guidelines were he to (i) proceed to trial and be found guilty, (ii) plead guilty to all the charges in the Information or (iii) enter into a plea agreement with the Government."  *Id*. at ¶ 20.  In doing so, Gleason correctly explained "that acceptance of responsibility was a factor the Court would take in his favor, together with his offer to voluntarily cooperate with the Government," and that "the amount of the loss to investors was a factor that could elevate the sentencing guidelines and result in a longer sentence."  *Id*.

The case upon which Illarramendi relies, *United States v. Gordon*, 156 F. 3d 376, 380 (2d Cir. 1998), is therefore distinguishable.  There, the attorney "wrote a letter to Gordon concerning his potential sentencing exposure, which concluded: 'I believe a conviction or convictions under this Indictment would result in a sentence of incarceration of 120 months.'"  *Id*. at 376.  The defendant thereafter rejected a plea offer and was found guilty after a bench trial.  *Id*.  He and his attorney later learned through the pre-sentence report that the guidelines range for imprisonment was in fact 262 to 327 months.  *Id*.  His attorney then "notified the district court that he had mistakenly advised Gordon that his maximum sentencing exposure upon a conviction would be only 120 months' imprisonment," and moved to be relieved as counsel, which the court granted.  *Id*.  The court subsequently sentenced Gordon to 210 months' imprisonment.  *Id*.

In his later motion to vacate his conviction under section 2255, Gordon argued that he was deprived of effective assistance of counsel. The court agreed, determining that the attorney was ineffective in failing to correctly advise Gordon of his potential sentencing exposure, and that, but for the inaccurate guidance, Gordon would have accepted the plea. *Id*. at 378. The Second Circuit affirmed, reasoning that "[b]y grossly underestimating Gordon's sentencing exposure in a letter to his client, [the attorney] breached his duty as a defense lawyer in a criminal case to 'advise his client fully on whether a particular plea to a charge appears desirable.'" *Id*. at 380 (internal citations omitted). The Court emphasized the district court's determination that the letter was "clear" in concluding that Gordon faced a "maximum incarceration of 120 months." *Id*. (internal quotation marks omitted).

In contrast, here, the advice from Gleason with which Illarramendi takes issue is far from a "clear" conclusion regarding Illarramendi's maximum sentencing exposure, as discussed. Moreover, Illarramendi correctly testified during plea colloquy that the maximum sentence was seventy years. Accordingly, Illarramendi has not established that Gleason's guidance regarding the benefits of cooperating and offering a guilty plea amounted to constitutionally ineffective representation, nor has he established a reasonable probability that Illarramendi would not have pleaded guilty if not for such advice. *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) ("In order to satisfy the prejudice prong with respect to a claim focusing on a plea of guilty, 'the defendant must show that there is reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'") (internal citations omitted).

To the extent that Illarramendi complains of his attorneys' failure to disclose any other possible sentencing enhancements, he has not articulated any facts in support; accordingly, those claims also fail.

Illarramendi contends that Gleason's assistance was constitutionally inadequate for the additional reason that Gleason "did not consider or discuss with [him] the applicability of the affirmative defenses of necessity and duress . . . or any other matters that may be mitigating factors" during a trial. Mot., Doc. No. 1, at 17. He argues that the applicability of those defenses, coupled with the possibility of loss enhancement, would have persuaded him to proceed to trial. *Id*. at 19.

As a preliminary matter, Illarramendi's sworn statements demonstrate that he was aware that he was waiving his right to present evidence in his defense by pleading guilty. During the plea colloquy, I explained to Illarramendi the rights that he would enjoy during trial, including his right to present favorable evidence:

> During the course of a trial, witnesses for the government would be required to come here into court and to testify under oath and in your presence. And through your lawyer, you would have the right to confront them, which means that you could ask them questions either to show they are not telling the truth or *to bring out information that might be helpful to your defense.*
>
> You would have the right to object to evidence offered by the government and *you would have the right to offer evidence, including the testimony of witnesses, in your defense.*
>
> . . .
>
> Whether or not you yourself testified, you'd have the right to call others as witnesses and you would have the ability to compel the attendance and testimony of reluctant witnesses by serving them with what's called a subpoena. And a subpoena, quite simply, is a form of court order that requires someone to come to court and to give testimony. So *if there's someone who knows something helpful to your defense but they don't want to become involved or come to court, you may be able to compel them to come to court and testify by serving them with a subpoena.*

Doc. No. 9, Hearing Tr. at 16:5–17:11 (emphasis added).

I then asked Illarramendi whether he understood the rights that I had outlined, to which

he responded, "I do." *Id.* at 17:12–17:14. I also asked:

> THE COURT: Do you understand these are rights that come along
> with a trial which is what follows a not guilty plea?
> THE DEFENDANT: I do.
> THE COURT: And do you understand that all of these rights,
> including your right to trial, are rights that you would waive if you
> plead guilty today?
> THE DEFENDANT: I do.
> THE COURT: And do you wish to waive all of these rights?
> THE DEFENDANT: Yes, at this time yes.

*Id.* at 17:12–17:25.

Moreover, Illarramendi has not sufficiently demonstrated how any failure to discuss the

specific defenses of necessity or duress fell below the low threshold of professional competency.

Illarramendi presents no facts to suggest that such defenses would have been meritorious at trial.

*Hill v. Lockhart*, 474 U.S. 52, 59 (1985) ("[W]here the alleged error of counsel is a failure to

advise the defendant of a potential affirmative defense to the crime charged, the resolution of the

'prejudice' inquiry will depend largely on whether the affirmative defense likely would have

succeeded at trial") (internal citations omitted); *see also Forbes v. United States*, 574 F.3d 101,

106 (2d Cir. 2009) ("[T]he Sixth Amendment does not require that counsel do what is impossible

or unethical. . . . It is well established that [t]he failure to include a meritless argument does not

fall outside the wide range of professionally competent assistance to which [a defendant is]

entitled.") (internal quotation marks and citations omitted). Rather, I find that Gleason's

statement in his declaration that no meritorious defense was available to Illarramendi in the

Criminal Action has merit. Ex. A to Resp., Doc. No. 10-1, at ¶ 16.

Duress and necessity defenses are intended to "to spare a person from punishment if he

acted under threats or conditions that a person of ordinary firmness would have been unable to

resist, or if he reasonably believed that criminal action was necessary to avoid a harm more serious than that sought to be prevented by the statute defining the offense." *United States v. Bailey*, 444 U.S. 394, 410 (1980) (internal citations and quotation marks omitted). To prevail on a coercion or duress claim, a plaintiff must prove the following elements: "(1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury; and (3) a lack of a reasonable opportunity to escape harm other than by engaging in the illegal activity." *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005) (internal citations omitted).

In the present case, Illarramendi vaguely asserts that a psychiatrist "had important insight into [his] state of mind during the Relevant Period and that he could testify to the influence that [his] situation of duress and necessity had on [his] actions." Mot., Doc. No. 1, at 26. That conclusory allegation is insufficient. Because Illarramendi has not adduced any concrete facts indicating that he experienced threats of force at the time of his crimes, that those threats engendered a fear of harm, and that there was no opportunity to escape, he has not established a "'reasonable probability' that advising [him] of the existence of the affirmative defense would have produced a result more favorable to him." *Mitchell v. Scully*, 746 F.2d 951, 955 (2d Cir. 1984). Accordingly, Gleason's alleged failure to discuss affirmative defenses did not amount to ineffective assistance.

Illarramendi further argues that Gleason failed to discuss "what rights [Illarramendi] was forgoing by voluntarily disclosing my actions to authorities or to what extent my disclosure could subsequently be used against me." Mot., Doc. No. 1, at 17. Because Illarramendi has not identified a reasonable probability that, but for those errors, he would not have pleaded guilty, that claim cannot prevail.

2. *Post-Plea and Sentencing*

Illarramendi additionally claims that the failure of his two subsequent lawyers, Attorneys Hernandez and Seeger, to move to withdraw his guilty plea or to consider withdrawing the plea after he asked them to do so reflected constitutionally ineffective assistance. A defendant may withdraw a guilty plea if the defendant "can show a fair and just reason for requesting the withdrawal." *United States v. Adams*, 448 F.3d 492, 498 (2d Cir. 2006) (quoting Fed. R. Crim. P. 11(d)(2)(B)) (internal quotation marks omitted). Courts consider the following factors in making that determination: (1) "whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea;" (2) "the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just);" (3) "whether the government would be prejudiced by a withdrawal of the plea;" and (4) "whether the defendant has raise[d] a significant question about the voluntariness of the original plea." *United States v. Schmidt*, 373 F.3d 100, 102–03 (2d Cir. 2004) (internal quotation marks omitted). In determining whether to grant a motion to withdraw, a court is "entitled to rely upon the defendant's sworn statements . . . that he understood the consequences of his plea [and] had discussed the plea with his attorney . . . ." *United States v. Hernandez*, 242 F.3d 110, 112 (2d Cir. 2001).

Illarramendi argues that I would have granted the motion to withdraw his plea on the basis that he did not understand the implications of the loss enhancement or the availability of affirmative defenses. *See* Supplemental Filing, Doc. No. 15, at 18. As I have concluded, however, those contentions are contradicted by the record. Accordingly, Illarramendi has failed to demonstrate why I would have allowed him to withdraw his guilty plea and has thus not established that he suffered prejudice under *Strickland*.

In addition, Illarramendi avers that Attorney Seeger was ineffective at sentencing because he failed to present evidence regarding the affirmative defenses of necessity and duress.  Mot., Doc. No. 1, at 23, 35–36, 39.  Significantly, it is clear from the record that Seeger discussed those arguments at length during sentencing.  On January 13, 2016, Seeger filed a 74-page sentencing memorandum, which was accompanied by twenty exhibits.  *See* Criminal Action, Def. Mem., Doc. No. 154.  In the memorandum, Seeger requested a downward departure under U.S.S.G. § 5K2.12, which provides that a sentence may be reduced if the defendant committed the offense because of serious coercion, blackmail, or duress.  *Id*.  In doing so, Seeger argued that Illarramendi's actions were a product of coercion, stating, *inter alia,* that "the initial loss of fund or assets that precipitated the instant offenses was spurred on by the actions of Venezuelan officials, intent upon making a profit. . . ."  *Id.* at 39.

Moreover, during sentencing, Seeger argued extensively that the environment in which Illarramendi operated was one of coercion and duress, and that such a climate warranted a downward departure under section 5K2.12.  *Id*., Doc. No. 183, at 93:2–96:18.  I rejected that argument, and Illarramendi has not established how any evidence, or how presenting those defenses in another way, would have led me to a different conclusion.  Even if Seeger did fail to raise the defenses at sentencing, because the failure to discuss them at the plea stage did not reflect constitutionally ineffective performance, any failure to raise the defenses at sentencing is also not a constitutional error.  *See Mitchell v. Scully*, 746 F.2d 951, 955 (2d Cir. 1984) ("Since we conclude that Mitchell's claim of ineffective assistance of counsel at the plea stage has no merit, there can equally be none in his contention with respect to counsel's failure to raise [the affirmative defense] on appeal.").

Illarramendi further challenges Seeger's failure to present testimony to support the affirmative defenses of duress and necessity. Particularly because that I rejected those defenses at sentencing, any decision not to pursue an expert on the issues was at most a "tactical error[] or mistake[] in strategy," for which I cannot grant relief. *United States v. Garguilo*, 324 F.2d 795, 797 (2d Cir. 1963) (internal citation omitted). Illarramendi may not now use "hindsight to second-guess his [attorney's] strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (internal citations omitted).

Illarramendi also complains about Seeger's actions and omissions with respect to the loss enhancement: he claims that Seeger failed to object to the loss enhancement at sentencing in a "documented and effective manner," that Seeger did not research the "'pledged or otherwise collateral' concept of the sentencing guidelines to the payments made to PDVSA prior to sentencing," and that Seeger failed to raise the "invalid nature" of the PDVSA claim. Supplemental Filing, Doc. No. 15, at 25. Those assertions, too, are belied by the record.

Hernandez first reserved his right to object to the loss amount listed in the PSR in his letter to the Probation Office on October 10, 2012. Ex. C to Resp., Doc. No. 10. Moreover, in his sentencing memorandum, Seeger spent twenty pages arguing that the loss amount was zero. Criminal Action, Doc. No. 154, at 39–61. He specifically disputed the government's loss calculation and set forth arguments why the loss amounted to zero. In doing so, he noted that, under U.S.S.G. § 2B1.1, cmt. 3(E)(ii), any loss is "reduced by any 'collateral pledged or otherwise provided by the defendant,'" and argued that the PDVSA claim should be reduced "by more than $600 million in financial benefits and fair market value of services derived by PDVSA from the Receivership," and by "negative effects in the value of assets caused by market forces

that are unrelated to the alleged fraud." *Id*. at 54. In addition, he asserted that "PDVSA arrives on the claim scene with unclean hands." *Id*. at 22.

 Seeger pressed that the loss should be zero again at sentencing. He stated that the PDVSA assignment contracts made the victims whole and that the loss was therefore zero under U.S.S.G. § 2B.1.1 comment and note 3E(2). *Id*., Doc. No. 183, at 24:17–25:12. He further argued that the PDVSA assignments were not valid. *Id.* at 53:17–54:10. Accordingly, Illarramendi's claims that Seeger did not research or raise those issues is without merit. And although I rejected Seeger's arguments, that does not in any way demonstrate that his performance fell "outside the wide range of professionally competent assistance." *Brown*, 124 F.3d at 79–80 (citing *Strickland*, 466 U.S. at 690).

Moreover, even if Seeger did not present the arguments relating to the loss enhancement in the precise manner Illarramendi would have preferred, the ineffective assistance of counsel claim would still fail because Seeger's performance was not incompetent or prejudicial. At sentencing, I determined that, because loss was too complex to calculate, the alternative measure—gain—was a more appropriate measure for guidelines purposes. Criminal Action, Doc. No. 183, at 70:21–72:3. My use of gain as a proxy had the effect of lowering the otherwise applicable Guidelines range; Illarramendi's gain of 20 million dollars increased his offense level by 22 points, whereas a calculation based on loss, which I determined was in excess of $200 million, would have increased Illarramendi's offense level by at least 28 points. *See* U.S.S.G. § 2B1.1(b)(1) (2014). Accordingly, my use of gain decreased Illarramendi's offense level by six points. Illarramendi's briefs present no argument that would have compelled me to reduce the loss calculation to a number lower than the gain calculation I actually used to calculate the Guidelines range. *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) ("With respect to

a claim of ineffective assistance in sentencing, the defendant must show a reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence.").

Illarramendi next challenges Seeger's failure to obtain and present evidence and expert testimony to refute the government's theory of loss during sentencing. In particular, Illarramendi maintains that his attorneys should have filed a *Brady* motion seeking certain evidence held by the government and receiver, including but not limited to:

i)      a clear breakdown of the assets which the Receiver alleges to have recovered and their provenance;

ii)     a clear breakdown of the valuation for the Cheyne shares and of certain Private Equity assets and of the processes whereby they were divested from the Receivership Companies;

iii)    a detail of the historical cash flows attributed to PDVSA and its affiliated entities during the relevant period, including the deductions made by the Receiver under NIM to reach their allowed amount under the Distribution Plan;

iv)     expert reports used by the Receiver in his evaluation of the Venezuelan market and legal applicability to PDVSA's claim;

v)      full disclosure and proof of PDVSA's payment in Venezuelan Bolivars, under the Assignment Agreements that gave rise to its claim rights; and

vi)     the collateral agreements, signed prior to discovery, which directly pledged assets of the Receivership Companies that were structured through intercompany loans, to support repayment of investor funds.

Mot., Doc. No. 1, at 25.

Illarramendi has not established prejudice from Seeger's failure to obtain the listed categories of documents. The conclusory allegation that such evidence "would have completely eroded the Government's theory of loss" does not suffice, particularly because I relied on gain when applying the "loss" enhancement of the sentencing guidelines. *Id.*, at 25.

Illarramendi further argues that Seeger should have deposed the government's expert to "determine how he arrived at his conclusions regarding loss" and assess his credibility, and that Seeger should have presented evidence obtained from Marco Penaloza, a "financial market legal

expert" in Venezuela, to counteract the receiver's affidavit. Supplemental Filing, Doc. No. 15, at 25. Seeger, however, did seek a hearing to present expert testimony, a request that I did not grant. Criminal Action, Tr., Doc. No. 183, 24:5–9, 62:4–18; Doc. No. 154, at 74 ("The Defendant hereby requests that he be entitled to cross examine Mr. Ong, and otherwise challenge the Government's proof, by leading his own expert and/or lay witness testimony in support of the 'zero loss' position asserted herein."). Moreover, Illarramendi has not presented any cognizable argument why that testimony or deposition would have altered the sentence that he received; because I focused on gain during sentencing, that evidence would not have been relevant.

Illarramendi additionally claims that he was deprived of effective assistance of counsel because Hernandez reviewed the first draft of the pre-sentence report for only five minutes, and because Seeger failed to do so. Mot., Doc. No. 1, at 22. Those contentions are not supported by the record. At sentencing, I asked Seeger, in Illarramendi's presence, whether he and Illarramendi "had a chance to review the presentence report and the addenda to that report." Criminal Action, Hr'g Tr., Doc. No. 183, at 5:11–14. Seeger stated that they had. *Id.* Accordingly, there was no violation of Rule 32(i)(1)(a), and Illarramendi's ineffective assistance of counsel claim cannot prevail on that ground. *See Cavounis v. United States*, 2015 WL 4522826, at *5 (S.D.N.Y. July 24, 2015) (dismissing ineffective assistance of counsel claim because defense counsel stated at sentencing that he and the defendant had reviewed the presentence report); *see also United States v. Beyer*, 166 F.3d 1201 (2d Cir. 1998) (same).

Illarramendi also contends that Seeger and Hernandez "did not file additional objections to the PSR or correct [previously-filed] erroneous objections," did not "present the Affirmative Defenses as mitigating factors," doc. no. 1, at 23, did not "not follow up with Probation with respect to the Affirmative Defenses or Loss Calculations," doc. no. 15, at 19, "submitted a

request for continuance of sentencing," *id*., and failed to meet with Probation, *id*. at 20. But Illarramendi has not established why those actions fell outside of the broad realm of constitutionally effective assistance, nor has he presented a colorable argument that he was prejudiced. Accordingly, those arguments must fail as well.

Moreover, Illarramendi asserts that his sentencing memorandum was submitted eight days late, which did "not allow for [him] to reply to the Government's response, particularly as it referred to the estimations of [his] alleged 'gain.'" Mot., Doc. No. 1, at 40. But Illarramendi had every opportunity at sentencing to articulate arguments that would have been included in a reply. Further, Illarramendi has not ever set forth evidence demonstrating that the amount of gain used at sentencing should have been reduced. Nor has Illarramendi identified any additional cognizable argument that Gleason should have made but did not, and therefore has not established why Illarramendi's untimely submission caused Gleason's performance to fall below the constitutional standard. The similar allegation that Seeger "failed to properly prepare for the sentencing hearing" is not supported by any additional facts and is therefore rejected. Mot., Doc. No. 1, at 26.

Finally, Illarramendi challenges his attorneys' failure to raise the *Luis* case—specifically, Gleason's failure to object to the TRO in light of *Luis* and Truskoski's failure to raise the *Luis* decision on appeal. Because I have concluded that Illarramendi has not sufficiently demonstrated that the assets at issue were untainted, Illarramendi has failed to establish how raising *Luis* at those stages would have had a reasonable chance of changing the outcome of the proceedings. Illarramendi's argument that Gleason's failure to request a *Monsanto* hearing in the SEC action amounted to ineffective assistance also fails for the same reason.

**IV.     Conclusion**

Illarramendi has failed to meet the requirements for a successful section 2255 petition.

Accordingly, his petition is **DENIED**.  Because Illarramendi has failed to make a "substantial

showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of

appealability will not issue.  The Clerk shall enter judgment and close the file.

So ordered.

Dated at Bridgeport, Connecticut, this 11th day of February 2020.


                                                    /s/ Stefan R. Underhill
                                                    Stefan R. Underhill
                                                    United States District Judge